CAROL M. FLORES, Indiv. and as Special Adm'r of the Estate of Victoria Flores, Deceased, et al., Plaintiffs-Appellants, v. DONALD L. CYBORSKI et al., Defendants-Appellees.

First District (2nd Division)   No. 1—92—1234

Opinion filed December 14, 1993.

McNeil, Fick & Barnow, P.C., of Chicago (Ben Barnow, Alan Goldberg, and Albert Cueller, of counsel), for appellants.

Wildman, Harrold, Allen & Dixon, of Chicago (David Kanter and Mary Elisabeth Ruether, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

These medical malpractice Wrongful Death (Ill. Rev. Stat. 1981, ch. 70, par. 2 (now 740 ILCS 180/2 (West 1992))) and Survival Act (Ill. Rev. Stat. 1983, ch. 110$^1$/$_2$, par. 27—6 (now 755 ILCS 5/27—6 (West 1992))) actions were brought to recover damages occasioned by the alleged negligence of defendant doctors in treating plaintiffs' decedent. The jury rendered a verdict for defendants upon which the court entered the judgment from which this appeal is taken. Appeal is also taken from the circuit court's denial of plaintiffs' motion for a new trial.

The questions raised on appeal include whether (1) the circuit court erred in denying plaintiffs' motion *in limine*; (2) defense counsel's opening statement and closing argument were unreasonable and prejudicial; (3) plaintiffs should have been permitted to attempt impeachment of a medical expert; (4) the circuit court erred in denying a request to bar an expert, strike part of his testimony, or depose him; (5) the circuit court erred in denying a motion for a directed verdict; (6) a pattern jury instruction improperly was given; and (7) the circuit court erred in granting defendants' motion for a directed verdict on the survival act aspect of the case.

In the morning on September 28, 1983, decedent was taken to the emergency room at Northwest Community Hospital complaining of severe abdominal pain and lower back pain. After testing, she was admitted to the hospital and was seen by the hospital's urology service for a suspected kidney infection. A surgeon who also saw her included possible pneumonia in his differential diagnosis.

Dr. Donald L. Cyborski, an internist, was called to see the patient on September 29 at about 3:20 p.m. Over the telephone, he ordered a set of preliminary diagnostic tests, including blood cultures, a Gram's stain of the patient's sputum, a sputum culture, and a urine culture. When Dr. Cyborski saw the patient shortly after the telephone call, she complained of chest pain and had a cough with congestion, but was not in respiratory distress. Based upon her appearance, Dr. Cyborski thought she had an infection. Her breath sounds were diminished, a finding partially explainable by a large amount of fat tissue around her chest. The patient's white blood cell count was 17,100, which Dr. Cyborski considered mildly to moderately elevated and indicative of a bacterial infection. He ordered Legionnaire's titers and cold agglutinins tests to rule out the possibilities of Legionella pneumonia and of Mycoplasma pneumonia.

After taking her history and conducting a physical examination, Dr. Cyborski reviewed her chest X ray and CT scan with a radiologist, who told Dr. Cyborski that he did not feel the X rays showed a pleural effusion, but that the CT scan might show effusion. Dr. Cyborski's impression was that the patient had left lower lobe pneumonia. He prescribed a broad spectrum antibiotic called Keflin.

At 12:30 a.m. the next day, the patient said that she was not really in pain and felt fine. Her color was described in her medical chart as pink. At 10 a.m., she appeared alert and more comfortable. At 3 p.m., she continued to deny pain. When Dr. Cyborski saw the patient, she said she was feeling better. She had less tenderness in the area around her lungs. She had more congestion, but this was expected by Dr. Cyborski because she had been dehydrated on admission and hydration makes a cough more productive. Based upon what the patient told him and his findings, Dr. Cyborski concluded that her condition had improved, but she was not cured of pneumonia. He continued the Keflin and ordered a chest X ray for the next morning, Saturday.

Dr. Marvin S. Peiken, an internist who works with and was covering Dr. Cyborski's hospitalized patients over the weekend, saw her the following day, October 1. She told Dr. Peiken that she was feeling better. Although the right lung sound at the base was a bit diminished, he was pleased because her lungs sounded better than he

anticipated. Dr. Peiken's impression was that the patient had atypical pneumonia, of which Mycoplasma and Legionella pneumonias are examples. Because Dr. Peiken suspected she had Mycoplasma pneumonia, to her medication he added Erythromycin, an antibiotic, which treats Mycoplasma pneumonia. He also continued the prescription of Keflin, since her condition appeared to have improved while she was on Keflin.

As of October 2, the patient continued to report that she felt better and her temperature had decreased. Dr. Peiken's impression was that the atypical pneumonia was resolving. The patient was sitting up in a chair and smiling. Her lungs were clear on both sides and she was breathing easily. The nurses' notes indicated that she was having no pain and was walking without shortness of breath. Her respiratory rates clearly improved. In Dr. Peiken's opinion, she was much better. He discussed discharging her, aiming for October 4.

At midnight on October 2, the patient was resting quietly. At 4:20 a.m. on October 3, however, she complained to the nurse of sharp shooting pains. Her pulse rose to 180. She was in distress, suffering diffuse pain, and short of breath. She was pale and her respiratory rates decreased to 38. The nurse did not call Dr. Peiken to alert him until 6:15 a.m., when he was told that his patient had just gone into cardiac arrest and they were trying to resuscitate her. Dr. Peiken went to the hospital immediately. When he arrived, she was being resuscitated, but did not survive the arrest. She had apparently suffered a pulmonary embolus and died at 6:55 a.m.

Prior to trial, defendants filed an affirmative defense claiming that the negligence of the Northwest Community Hospital nurses was the sole proximate cause of decedent's death. The hospital, originally named a defendant, was dismissed in 1988 upon a $300,000 settlement with plaintiffs. Plaintiffs' motion to dismiss the affirmative defense was denied.

Plaintiffs also moved to bar portions of their own expert's report, where he had mentioned the hospital and its nurses. The circuit court ruled that reference to a dismissed party's negligence is appropriate as long as its status as a former party is not revealed.

Plaintiffs moved *in limine* to bar any reference to the relationship between their expert, Dr. Stewart Sharp, and his brother Stephen Sharp, and to bar defendants from calling Stephen as a trial witness. Stephen had actively worked on the case while an associate with plaintiffs' attorneys' firm. He had hired his brother to review the case and received his initial reports. Stephen Sharp also apparently took Dr. Cyborski's and Dr. Peiken's depositions before leaving plaintiffs' counsels' firm in 1987.

The court precluded defendants from calling Stephen Sharp to establish the relationship, and ruled that defendants would be barred from mentioning the Sharp brothers' relationship because it was too inflammatory. On a motion to reconsider, the circuit court vacated its previous order, noting that Illinois Pattern Jury Instructions, Civil, No. 2.01 (3d ed. 1992) (hereinafter IPI Civil 3d) and case law leave the issue of expert credibility to the jury.

At trial, decedent's mother testified Dr. Peiken told her on October 2 that her daughter's fever was going down and if she continued to progress, she could probably go home in two or three days. She believed that her daughter had improved; she sounded better and her fever was down. She agreed that by the morning of October 2 all her daughter's symptoms seemed to be getting a little bit better.

Decedent's sisters, Rose Marie Panknin, Elizabeth Harrison, and Christina Marie Flores Robinson, also testified. Rose Marie had spoken to her sister in the hospital on October 1. She believed that the decedent told her that she was feeling better. She did not say that she was uncomfortable, in pain, or in distress. Elizabeth did not know that the decedent was ill until after she died. Her parents told her that they did not inform her sooner because they thought that their daughter was getting better. Christina, also decedent's sister, shared her trust and confidence. When they spoke over the telephone decedent told her that she felt "okay." Christina would have visited her sister if she thought that she was seriously ill. Decedent's father testified that he never believed that she was getting better. He also testified that the mass on his daughter's back was the size of a basketball.

Dr. Stewart Sharp, board certified in internal medicine, testified that he was first approached about the case by his brother, Stephen, an associate at plaintiffs' attorneys' firm. His brother asked for a frank opinion about whether things were done properly.

According to Dr. Sharp, Dr. Cyborski deviated from the standard of care by: (1) not recognizing the severity of the decedent's pneumonia when she was admitted to the hospital, (2) not obtaining a blood gas study, (3) not relieving impairment of the lung, and (4) not choosing an appropriate antibiotic. Dr. Sharp testified that Dr. Peiken deviated from the standard of care by: (1) not recognizing an evident worsening of the decedent's condition, (2) not obtaining a blood gas study, and (3) prescribing an inappropriately low dose of Erythromycin orally instead of intravenously. A blood gas study would have determined whether a change in the decedent's lungs decreased the amount of oxygen in her blood. Later X rays showed injury to the

right lung which did not previously exist. Decedent's resting respiratory rate was higher towards the end of her hospitalization. Low blood oxygen drives the respiratory rate. Pleural fluid comes from inflammation, is a product of the body fighting infection, and impairs lung function to a modest degree. It can be removed though a procedure called thoracentesis, or pleural tap, in which a needle is put through the patient's back. If removed, the fluid can be useful in determining the cause of an infection through cultures and sensitivities. Pleural fluid can be used to test for Legionnaire's disease with almost 100% certainty and test results can be obtained in minutes to hours. Dr. Sharp said that results from the type of Legionella titer test ordered by Dr. Cyborski take a couple of weeks.

Dr. Sharp suggested that percussion and drainage should have been done. In his opinion, decedent was not improving under Dr. Cyborski's and Dr. Peiken's care, based on notations in the medical records that she had abnormal breath sounds, shortness of breath, fever, pain, and nausea. An October 1 note indicating that the patient denied discomfort did not play a role in his opinions because she had a fever; patients try to discount their pain. Dr. Sharp could not accept that the patient was really comfortable; she was denying the degree of symptoms that she was having. Dr. Sharp believed that Tylenol was responsible for what was described as improvement. The decrease in decedent's body temperature coincided with the administration of Tylenol and Tylenol with Codeine. Erythromycin did not cause a decrease in decedent's temperature. In Dr. Sharp's opinion, Dr. Cyborski's conduct contributed to decedent's death and Dr. Peiken's and Dr. Cyborski's failure to meet the standard of care increased the harm or risk to the decedent which contributed to her death.

On cross-examination, Dr. Sharp acknowledged that he was testifying about the standard of care for physicians in the Chicago area in September and October of 1983, although he never practiced in the Chicago area and he was only a third-year resident at the time. Oxygen is typically ordered when blood gas results are abnormal, but will not help cure pneumonia nor rid the body of an infection. The patient's color is a factor in deciding whether to order a blood gas study, which demonstrates the receiving of an inadequate supply of oxygen. Obese people such as decedent may have very moderately increased respiratory rates, except when at rest. Fear, anxiety and pain can also increase the rate. Dr. Sharp agreed that when there is only a small amount of fluid, thoracentesis is made more difficult; the difficulty and risk would be increased because of the decedent's weight. Even if thoracentesis had been done, there was really only a 20% chance of identifying the organism causing

the infection. The probability of thoracentesis identifying the organism causing the infection was further decreased by antibiotics. The cause of decedent's pain was pleuritis, or inflammation of the lung lining. Tylenol is not an anti-inflammatory and will not treat inflammation. Dr. Sharp agreed that although pneumonia may be getting better, an X ray might look worse. The diagnosis of pneumonia was reasonable. The likely cause of death was a sub-massive pulmonary embolus. The patient actually died from respiratory failure, but the immediate precipitating event was very likely a pulmonary embolus. The embolus was something less than massive because the patient did not die instantaneously. He agreed, however, that the pulmonary embolus was sudden. Dr. Sharp had no criticism of defendants for not diagnosing it.

Dr. Sharp testified that it is more probably true than not that decedent would not have died from pneumonia, given her age and relative health conditions in 1983. The Northwest Community Hospital nurses deviated from the standard of care. Their responsibility was to recognize the change in decedent's condition, respond to those changes, and notify Dr. Peiken on the morning of October 3; however, he was not called until after the changes were well underway. The nurses' grave error was not the total cause of death. The failure to obtain the blood gas to determine the amount of oxygen in her blood, failure to provide antibiotics at an effective dose, and failure to recognize a change in her condition on October 1 caused her to have substantially decreased lung capacity so that any small additional injury could have caused her death. If not for her weakened condition, she more probably than not would have survived the pulmonary embolus.

Defendants' motions for directed verdicts were taken under advisement.

Defendants' expert, Dr. Jesse Hall, board certified in internal medicine and critical care medicine, testified that both Dr. Cyborski and Dr. Peiken complied with the applicable standard of care. In Dr. Hall's opinion, decedent died of a pulmonary embolus, which was unexpected and sudden. It was reasonable, however, for defendants to diagnose community-acquired pneumonia. Dr. Hall stated that it was equally possible that there are two equally satisfying explanations for what first brought decedent to the hospital: she had a community-acquired pneumonia that she was recovering from, following which she suffered a massive and lethal blood clot in the lung; and that the earliest event that she suffered from, which could very easily mimic pneumonia and all of its characteristics, was an earlier pulmonary embolus followed by a second pulmonary embolus that caused her

death. Failure to order a blood gas study was not a deviation from the appropriate standard of care.

Decedent's decreased white blood count indicated that she was getting better, supported by virtually every piece of data collected and every recollection from everybody who saw her. Dr. Cyborski did not deviate from the standard of care by not doing thoracentesis. The antibiotic treatment prescribed was appropriate. The standard of care did not require postural drainage and percussion. The pulmonary embolus that formed at 4:20 a.m. was so massive that it took decedent's life. Such an embolus is sudden, with deterioration occurring over minutes to hours. He did not agree that the alleged failures to properly treat pneumonia left decedent in a weakened state so that she could not fight the pulmonary embolus. If she had pneumonia, the treatment was appropriate. She was improving and close to being discharged. Tylenol was not responsible for decedent's documented improvement. In hindsight, Dr. Hall could say in his opinion that it is more likely that the decedent did not have pneumonia, but he could not be certain.

Dr. Cyborski testified that an arterial blood gas study was not called for because there was no indication that she was low on oxygen. Only one-seventeenth of her lung was involved with the pneumonia, which should not have impaired the amount of healthy lung tissue available for providing oxygen. Furthermore, her color was good. He had considered thoracentesis, but decided against it because the chest X ray and CT scan reviewed with the radiologist showed no evident pleural effusion. There is a much higher risk of puncturing a lung when there is a small amount of fluid. Furthermore, because decedent had a lot of fatty tissue, the landmarks used during the procedure were greatly obscured, making the procedure risky. He did not order postural drainage and percussion because they were not indicated.

Dr. Peiken testified that Erythromycin is a good drug for Mycoplasma pneumonia, which was the main thing he was considering. The Legionella titer came back normal. When intravenous Erythromycin is given there is a significant risk for irritation of the veins that can cause phlebitis and clots as well as the risk of a very serious allergic reaction. Decedent's signs of improvement were not attributable to Tylenol. The type of sharp chest pain she initially had could not be controlled by Tylenol. He did not do a blood gas study because it was not indicated. When he saw decedent on Saturday and Sunday, her chest pain had gone away, her respiratory rate was diminishing on a steady basis, she was breathing easy and her color was nice and pink. Dr. Peiken would have liked to have known about the dramatic change in the decedent's condition in the early morning of October 3.

When he arrived at the hospital, she had died. He wanted to know if he had missed anything which might have prevented her death. He examined her legs to see if there were signs of clots, but found no abnormalities. His care for the decedent complied with the pertinent standard of care.

The court denied defendants' motions for a directed verdict as well as plaintiffs' motion for a directed verdict as to defendants' affirmative defense of sole proximate cause.

Following argument, the jury returned a verdict in favor of defendants. Post-trial motions were denied, as earlier noted.

## I

Plaintiffs contend that the circuit court erred in denying their motion *in limine* to bar defendants from eliciting testimony regarding the relationship between plaintiffs' medical expert and his brother, a former associate in the office of plaintiffs' counsel. The relationship was not probative of any issue and disclosure would cause far more harm than good. The circuit court initially granted plaintiffs' motion, but reversed itself upon reconsideration, as previously observed.

Plaintiffs assert that (1) the testimony about the relationship was sought to insinuate that Dr. Sharp testified because of his relationship with Stephen Sharp; (2) there was no interest, financial or otherwise, between the brothers; and (3) the inflammatory effect cannot be overstated.

A jury must decide whether a defendant physician complied with or deviated from the applicable standard of care based upon expert medical testimony that has been given during trial. (*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 297, 529 N.E.2d 552; *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42, 489 N.E.2d 867; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301.) Expert testimony, then, is critical in medical negligence cases.

■ Illinois courts have repeatedly held that the relationship between a plaintiff's expert and a plaintiff's attorney is an appropriate area to probe during cross-examination. For example, in *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297, the court found it proper to inquire upon cross-examination into an expert's financial testimonial interest. (*Trower*, 121 Ill. 2d at 218.) The supreme court recognized "the ever-increasing importance of bringing to the jury's attention facts by which the jury may reasonably discount the credibility of an expert's testimony." (*Trower*, 121 Ill. 2d at 217.) In *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210, the court held that defense counsel should have been allowed to cross-examine plaintiff's expert concerning his relationship with plaintiff's counsel,

*e.g.*, the number of referrals plaintiff's expert had received from plaintiff's counsel. (*Sears*, 102 Ill. 2d at 411.) The *Sears* court emphasized that it was not suggesting that there was anything improper about the relationship between plaintiff's counsel and plaintiff's expert: "We believe the jury is in the best position to make this decision, but an informed decision is impossible if defense counsel is not allowed to probe this subject on cross-examination." (*Sears*, 102 Ill. 2d at 410.) The *Sears* court recognized that because opinion testimony, unlike factual testimony, is difficult to disprove, "[t]he principal safeguard against errant expert testimony is cross-examination." (*Sears*, 102 Ill. 2d at 407.) In the present case, plaintiffs' sole testifying expert witness, Dr. Stewart Sharp, was the brother of a former associate of plaintiffs' counsel, Stephen Sharp. There was no evidence presented to suggest that Stephen Sharp had a financial interest in the outcome of this litigation, but there was evidence offered to suggest that Dr. Sharp's testimony may have been colored by his relationship with Stephen Sharp. The jury should have been and was allowed to consider this possibility or probability. There was no error.

Defendants raised the question of Dr. Sharp's limited experience and credentials, and questioned why he was plaintiffs' sole expert witness.

The evidence presented at trial demonstrated that Dr. Sharp was retained to testify in this case by his brother Stephen while Stephen was an associate at plaintiffs' law firm. In September and October 1983, the period involved here, Dr. Sharp was a third-year resident. He never practiced medicine in the Chicago area. At the time of his trial testimony, Dr. Sharp had been in private practice only for approximately four years. He practices in Danville, Virginia, is on the staff of a community hospital there, and his practice is devoted almost exclusively to oncology and hematology. Had Victoria Flores come to his hospital with the condition and symptoms that he described her to have, he admitted he would not have been the doctor or type of doctor who would have treated her. He never authored a medical article or textbook in which pneumonia or pulmonary embolus was discussed; he authored one article in his career, dealing only with cancer, and he holds no teaching appointments.

Plaintiffs attempt to minimize Stephen Sharp's involvement in this case by disclaiming that he had any financial interest in the outcome of the litigation. The record shows, however, aside from soliciting the opinion of his brother, Stephen Sharp actively participated in this litigation, particularly the depositions of Carol Flores, Antonio Flores, Dr. Marvin Peiken, Dr. Donald Cyborski, Dr.

Thomas Duffy, Dr. Daniel Piazza, and Dr. Thomas Sammons. He was the recipient of the first comprehensive evaluation provided by Dr. Sharp on June 7, 1985. Plaintiffs' claim that the absence of financial gain by Stephen Sharp precluded revelation of the relationship is without support under these facts. Given Dr. Sharp's limited experience and credentials, defendants could properly question why he, of a plethora of board-certified specialists in internal medicine in this country, was sought out to act as plaintiffs' sole expert witness. A reasonable inference which the jury could have drawn from these facts was that Stephen Sharp retained his brother because the former might have expected a friendly analysis of the issues.

Plaintiffs were given ample opportunity in redirect examination and on closing argument to dispel any unfavorable inferences. There was no error committed in this respect.

## II

Next, plaintiffs assert that defense counsel's opening statement and closing argument were unreasonable and prejudicial.

Plaintiffs point to defendants' opening statements regarding the relationship between the Sharps as well as several statements which were allegedly not supported at trial:

"Even her parents, Mr. and Mrs. Flores, who had been to the hospital every day to see [decedent] agreed that [she] was looking better, she was in better spirits. Everyone who saw [decedent] on October 2, 1983 agrees that she was looking and feeling better.

I believe Dr. Sharp will tell you that [decedent] died from a sudden massive pulmonary embolus."

Plaintiffs assert that defense counsel also made the following allegedly improper argument during his opening statement:

"Dr. Sharp is a doctor whom [sic] is in Danville, Virginia, who has decided to specialize in oncology which is the treatment of cancer, which is kind of odd because [decedent] didn't have cancer."

The comment that towards the end of the hospitalization decedent's parents agreed that Victoria was "looking better, she was in better spirits," was based upon the following: Decedent's mother testified at her deposition that on Sunday, October 2, her daughter seemed like her pressure had been relieved, her congestion was not as severe, and her pain was a little bit better. By Sunday, all the symptoms seemed to be getting a little bit better. Decedent's father testified at his deposition that his daughter told him on October 2 that she felt better. At trial, decedent's mother testified consistently with her deposition. Her father, however, testified that he could not recall whether his daughter told him that she felt better, and he said

that he never believed she was getting better. He did admit at trial, however, that as of October 2 he was told that Victoria's fever had broken. His trial testimony, that he did not believe his daughter was getting better, was contradicted by the trial testimony of Victoria's sister, Elizabeth Harrison, who said that her parents told her that they did not inform her of her sister's illness because they thought Victoria was getting better.

■ Defense counsel's statement, that "everyone who saw Vicky on October 2, 1983 agrees that she was looking and feeling better," similarly was supported, not only by the testimony of Victoria's family members, but by the testimony of Drs. Peiken and Hall. Dr. Sharp testified as well that the medical personnel who saw the decedent on October 2 felt that she was improving and feeling better. Although defendants did not call every nurse or doctor who saw decedent on this date to testify, the medical records which were reviewed by defendants and the experts support this conclusion.

Plaintiffs claim that defendants' attorney had no basis for believing that Dr. Sharp would testify decedent died from a sudden massive pulmonary embolus. At his deposition, however, Dr. Sharp was asked his opinion about the cause of decedent's death. He answered that the "mechanistic cause" was respiratory failure and the immediate cause may have been from one of several potential problems, "the most likely was massive or sudden massive pulmonary embolus." Defense counsel thereby was entitled to say he expected Dr. Sharp to testify that decedent had a sudden massive pulmonary embolus at trial.

Plaintiffs assert that defense counsel exaggerated the false and misleading impression that Dr. Sharp was involved in this matter only because he had an attorney-brother who once worked with plaintiffs' counsel. Plaintiffs claim that the three sentences made during the defendants' opening statement were "obviously false from the beginning" and that another statement was improperly argumentative. Plaintiffs' claims ignore the perspective of defense counsel at the time the opening statement was given. He then was relying on the depositions taken in this case. The comment about Dr. Sharp's specialty being "odd" may have been technically argumentative, but it raised an appropriate question, it was made in good faith, and it did not impermissibly prejudice plaintiffs. Further, the court admonished the jury that opening statements are not evidence. It should be noted that defense counsel also told the jury, "Keep in mind what I say is not evidence. It is simply my prediction of what the evidence will show. And it is my responsibility to prove my prediction."

Defense counsel's comments concerning Dr. Sharp's specialty raised an objection from plaintiffs during opening statement only as to the characterization of Dr. Sharp's specialty as "odd." The court correctly decided not to highlight it. Dr. Sharp acknowledged that if decedent were admitted to his hospital, he would not be called to see her because he specialized in oncology and hematology. The word "odd," therefore, was not beyond permissible comment in light of the medical facts of this case. No error resulted.

Plaintiffs contend that defense counsel's closing argument introduced facts not in evidence, distorted the trial testimony, and introduced unreasonable inferences based on the trial testimony. Plaintiffs point to the following:

"And who is the one doctor, the one doctor that has come into this courtroom to criticize *** of the tens of thousands of board certified specialists in internal medicine, and who is the one doctor that Mr. Barnow has brought you? Dr. Stuart Sharp, the brother of the attorney from Mr. Barnow's firm who originally worked on this case.

He has put on days of testimony to prove that point, and then he wants you to ignore the fact that the only doctor he could find to come in and criticize *** is the brother.

The only doctor he could find was the brother of the attorney who used to represent the Flores family with him, the only doctor he could find. Doesn't that tell you something about the strength of their case? Doesn't that tell you something about Dr. Sharp's credibility?"

Plaintiffs assert that there was absolutely no evidence to support the above statements and that it is unrealistic to conclude that the jury was not unfairly swayed. Also asserted is that the cumulative effect of these statements cannot be ignored or discounted.

Plaintiffs failed to object to defendants' counsel's remark during closing argument that Dr. Sharp was "the one doctor that has come into this courtroom to criticize Dr. Peiken and Dr. Cyborski of the tens of thousands of board certified specialists in internal medicine." Plaintiffs have waived their right to object to that and similar remarks now where no objection was made at trial. (*In re Salmonella Litigation* (1990), 198 Ill. App. 3d 809, 556 N.E.2d 593, *appeal denied* (1990), 133 Ill. 2d 557; *Daniels v. Standard Oil Realty Corp.* (1986), 145 Ill. App. 3d 363, 495 N.E.2d 1019, *appeal denied* (1986), 113 Ill. 2d 558.) Waiver aside, this remark was proper. Dr. Sharp indeed was the one doctor who criticized Dr. Peiken and Dr. Cyborski at trial. The evidence revealed that there are many board-certified specialists in internal medicine who could have been called upon to testify. This comment reasonably was supported by the record.

Plaintiffs objected to the statement that Dr. Sharp is the only doctor the plaintiffs' attorney could find to criticize defendants. Following this objection, the court instructed the jury that it was argument and that "[t]o the extent that it helps you in understanding the evidence you may consider it or not as you choose." This was a neutral remark by the court which was an accurate statement of the law. Defendants' closing argument does not require reversal. See *Tamalunis v. City of Georgetown* (1989), 185 Ill. App. 3d 173, 189, 542 N.E.2d 402, *appeal denied* (1989), 128 Ill. 2d 672.

Plaintiffs' counsel took full advantage of their opportunity to explain their choice of Dr. Sharp to the jury during rebuttal.

Plaintiffs also complain of the following statements as being false and misleading:

"Dr. Sharp believes that this [the decedent's fatty mass] was a figment, that it wasn't real, it is not a real thing."

The record reveals that Dr. Sharp so testified. Plaintiffs also complain of the following remark by defense counsel:

"So Dr. Sharp doesn't believe anything that is in the record and he doesn't believe anyone says what they mean including, [the decedent]."

Dr. Sharp admitted that there were a number of medical record entries which described decedent's condition as improving with which he disagreed. He also asserted that decedent herself did not accurately describe how she was feeling.

Defense counsel's argument was based upon reasonable inferences drawn from the evidence and cannot be the bases for a new trial.

### III

Plaintiffs maintain that they should have been permitted to impeach defendants' medical expert over his change in testimony.

Plaintiffs point to the inconsistencies between Dr. Hall's deposition and trial testimony. During Dr. Hall's deposition testimony, he asserted that with the benefit of a retrospective analysis he thought decedent did not have pneumonia. At trial, he asserted that it was possible that there are two equally satisfying explanations for what first brought her to the hospital.

"It is entirely possible that she had a community acquired pneumonia that she was recovering from, following which she suffered a massive and, in fact, lethal blood clot in the lung.

It is also possible that the earliest event that she suffered from, which could very easily mimic pneumonia and all of its characteristics, was an earlier pulmonary embolus followed by a second pulmonary embolus that caused her death."

At his deposition, he also stated:

"An alternative, but I feel slightly less likely possibility, is that indeed she came [*sic*] hospital with a community-acquired pneumonia."

After hearing the above apparently conflicting testimony, the court held a *voir dire* examination of Dr. Hall. Dr. Hall asserted that he believed decedent never had pneumonia. Finally, on continued direct examination, defense counsel sought to rehabilitate his expert to the effect that Dr. Hall testified that it was more likely that decedent did not have pneumonia, but he could not be certain. When plaintiffs' counsel attempted to impeach the doctor, the court stated that there was no inconsistency and, therefore, sustained defendants' objection.

Plaintiffs assert that their counsel should have been permitted to cross-examine Dr. Hall because the doctor's opinion allegedly contradicted defendants' skills. Plaintiffs specifically point to defense counsel's use of Dr. Hall's testimony in closing argument.

■ Whether Dr. Hall believed decedent had pneumonia is irrelevant in terms of Dr. Hall's opinions on negligence because Dr. Sharp did not criticize the diagnosis. Further, whether decedent had pneumonia played no role in Dr. Hall's ultimate conclusion that she died from a pulmonary embolus. Dr. Hall's testimony shows only that. it was not clear whether decedent had pneumonia.

Furthermore, defendants assert that no prejudice occurred because the jury heard the alleged inconsistency and plaintiffs' counsel tied it up during closing argument and attacked Dr. Hall's credibility.

Plaintiffs were not denied a fair trial by virtue of the circuit court's rulings in this regard.

### IV

Plaintiffs insist that their requests to bar Dr. Hall's testimony, to strike that part of his testimony that was beyond the scope of his deposition testimony, and for time to depose him were improperly denied, which materially affected the preparation and presentation of their case, in violation of Supreme Court Rule 220. 134 Ill. 2d R. 220.

■ As indicated under point III of this opinion, the circuit court's decision neither to bar Dr. Hall's testimony nor to permit plaintiffs to redepose him during trial was proper and not an abuse of discretion. The testimony was not inconsistent, nor did it go beyond the fair scope of his deposition.

### V

Plaintiffs next claim that their motion for a directed verdict on defendants' affirmative defense should have been granted.

Defendants' affirmative defense was submitted to the jury, stating that

> "[t]he failure of Northwest Community Hospital nurses to recognize and properly respond to the change in [decedent's] condition at approximately 4:20 a.m. on October 3, 1983, was the sole proximate cause of [decedent's] death."

Plaintiffs maintain that the evidence did not support the defense and, therefore, it was improper to deny the motion for a directed verdict at the close of the evidence.

Motions for directed verdicts at the close of the evidence are properly entered only where all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 466 N.E.2d 1085.

In support of the court's decision not to strike the affirmative defense, defendants point to Dr. Sharp's assertion that the nurses deviated from the standard of care; that this deviation could have caused decedent's death; and that had the nurses met the standard of care, decedent might have survived the pulmonary embolus. Also noted is Dr. Sharp's admission that after first reviewing the case for his brother, he wrote a report indicating that the nurses contributed to decedent's death in failing to appropriately respond to the sudden change in her condition. Additionally, Dr. Peiken testified that he wanted to have known about the dramatic change in decedent's condition. Plaintiffs could have but failed to submit a special interrogatory, illuminating what role, if any, the sole proximate cause defense played in the jury's verdict.

■ There was sufficient evidence at trial upon which the jury could have found that the nurses' conduct here was the sole proximate cause of decedent's demise. The circuit court did not err in its refusal to direct a verdict on defendants' affirmative defense.

## VI

Plaintiffs argue that IPI Civil 3d No. 12.04 was improperly submitted to the jury, particularly that submission of the second paragraph of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) was error. The jury was told:

> "However, if you decide that the sole proximate cause of injury to Plaintiffs was the conduct of some person other than the Defendants, then your verdict should be for the Defendant."

■ Plaintiffs assert that because this paragraph of IPI Civil 3d No. 12.04 is only to be given where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a

third person, and because the issue of sole proximate cause allegedly never became an element of the defense, IPI Civil 3d No. 12.04 never should have been given. Plaintiffs contend that by giving the instruction to the jury, the court enabled defendants to have the jury consider a scenario not supported by the evidence, which allegedly resulted in unfair prejudice.

As noted under the previous point, the circuit court properly allowed defendants' affirmative defense to stand under the evidence and it was proper to instruct the jury on sole proximate cause for that reason.

## VII

As their final point, plaintiffs urge that defendants' motion for a directed verdict on plaintiffs' Survival Act action was improperly granted.

The court granted the motion as to the survival action finding that there was no evidence that Dr. Cyborski and Dr. Peiken caused decedent's pain. The circuit court declined to allow the jury to speculate on the issue.

Plaintiffs assert that if the doctors properly diagnosed the decedent, they could have eliminated much of her pain. Plaintiffs point to an expert's belief that the quicker one is cured, the quicker the pain and misery are over. Plaintiffs suggest there was enough evidence to draw a reasonable inference that defendants' negligence caused the decedent to suffer more pain and discomfort than she would have otherwise.

■ Defendants were found not liable for wrongful death; letting the jury decide the survival claim would not have resulted in a verdict in plaintiffs' favors. The court did not err in having granted defendants' motion.

For the reasons set forth above, we affirm the jury's verdict in this case and the circuit court's denial of plaintiffs' motion for a new trial.

Affirmed.

SCARIANO and DiVITO, JJ., concur.