(No. 75984

BYRON J. HOLSTON et al., Appellees, v. THE SISTERS OF THE THIRD ORDER OF ST. FRANCIS, Owner and Operator of St. Anthony Medical Center, Appellant.

Opinion filed April 20, 1995.

HEIPLE, J., dissenting.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Norman J. Barry, Jr., Michael A. Pollard and Thomas W. Cushing, of counsel), for appellant.

Albert F. Hofeld and Howard Schaffner, of Hofeld & Schaffner, of Chicago, for appellees.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, The Sisters of the Third Order of St. Francis, as owner and operator of St. Anthony Medical Center (St. Anthony), appeals from a $7.3 million verdict entered against it in the circuit court of Cook County for the wrongful death of a patient, Theodora Holston (Holston). Plaintiffs are decedent's children, Byron J. Holston and Heather L. Holston, who are co-administrators of her estate. All defendants other than St. Anthony settled with plaintiffs during trial. The jury awarded damages upon the wrongful death claims of Holston's husband and two children, and also compen-

sated Holston's estate for her pain and suffering and disability and disfigurement. The appellate court affirmed. (247 Ill. App. 3d 985.) We allowed the defendant's petition for leave to appeal (145 Ill. 2d R. 315).

Defendant challenges certain of the trial court's rulings and also contends that the verdict was excessive. Specifically, defendant claims: (1) plaintiffs' expert witness should have been precluded at trial from rendering an opinion that differed from or supplemented his deposition opinion regarding the hospital's care; (2) defendant's employee, a treating nurse, was wrongly precluded from giving an opinion as to the nursing standard of care; (3) defendant's motion to transfer venue, which occurred during the trial and after plaintiffs dismissed the sole Cook County defendant, should have been granted; (4) the decedent's pain and suffering and disability and disfigurement were improper elements of damages in light of her failure to regain consciousness; (5) on the issue of loss of consortium, the court should have admitted evidence that the decedent had been separated from her husband for a period of four months, although the separation had ended approximately $1^1/_2$ years before her death.

We affirm the appellate court.

## BACKGROUND

During the morning of January 12, 1978, Theodora Holston, aged 29, underwent gastric bypass surgery at St. Anthony's Medical Center in an attempt to reduce her weight. Dr. George Arends, the anesthesiologist, placed a central venous pressure (CVP) catheter into Holston's right internal jugular vein, which was threaded down to rest in a blood vessel above her heart. The purpose of the catheter was to monitor Holston's fluids and central venous pressure. At 1 p.m., following her surgery, Holston was brought to the special care unit for post-operative care.

Unknown to anyone, the CVP catheter at some point punctured Holston's heart and became embedded in a portion of her heart muscle. The nine-inch long catheter ran down the internal jugular vein into the heart and through the heart wall with the tip just beyond the heart wall into the pericardial sac. This caused the fluid from the IV to pass into the pericardial sac rather than into the intended blood vessel. The continuing accumulation of fluid in the pericardial sac created an increasing pressure on Holston's heart, which eventually caused her to go into cardiac arrest. The medical term for the accumulation of fluid in the pericardial sac is cardiac tamponade, which is a life-threatening condition characterized by increased CVP readings, increased pulse rate, a condition known as pulsus paradoxus, and decreased blood pressure.

One of the primary issues at trial was whether St. Anthony, through its nursing staff, should have detected the patient's deteriorating condition and notified doctors of her condition at an earlier time. According to evidence in the record, cardiac tamponade is a reversible condition if corrected early enough. Treatment for an early tamponade is a relatively simple matter of inserting a hypodermic needle into the pericardial sac and withdrawing the fluid. At trial, plaintiffs presented evidence that Holston's tamponade had begun by 4 p.m. on January 12, 1978, and, although her treating nurse made several attempts to persuade the charge nurse to summon the doctors, it was not until 6:50 that Holston was brought into emergency surgery in an unsuccessful attempt to save her life.

Christine Carlson was the staff nurse who undertook the care of Holston during the critical hours before her death. According to her videotaped evidence deposition, which was shown to the jury at trial, the following chronology of events occurred while Carlson attended

Holston. Shortly after Carlson came on duty, at 4 p.m., she observed from the patient's medical chart that Holston's pulse had risen to 120 beats per minute from a post-surgery baseline in the seventies. Carlson asked the nurse who had been attending Holston before 4 p.m. about the increase and was told only that the patient was "agitated." Carlson then asked her supervisor, charge nurse Pam Markin, to examine the patient. However, Markin did not examine the patient at 4 p.m. or at 4:20 p.m., when Carlson repeated her request. Carlson testified that she believed that the patient might have been in the early stages of cardiac tamponade, based on her observations of several indicators, including the CVP reading, the elevated pulse, and the marginal urinary output of the patient. By 4:45, a warning buzzer had sounded on Holston's pulse monitor three times, and her pulse had risen to 140. Carlson again asked Markin to check the patient, urging her to contact Dr. Sharp, the treating physician. Carlson conveyed her belief that Holston was tamponading, but Markin did not agree that it was necessary to notify Dr. Sharp. Markin instructed Carlson to simply monitor the patient for indications of a dropping blood pressure, which would indicate the presence of cardiac tamponade. Markin told Carlson that the elevated pulse rate could be explained by the "restlessness" of the patient.

Carlson testified that Holston appeared to be resting comfortably at 4 p.m. but that she later expressed concern over the number of times Carlson left her bedside to talk to Markin. Although Carlson was unaware of it at the time, Holston was a nurse herself.

Carlson was concerned about Holston's low urinary output, which indicated to her that something was definitely wrong and that Holston's heart was not functioning properly. In addition, Holston's pulse rate was continuing to climb and her CVP was significantly

high. By 5 p.m., Carlson considered Holston's condition to be so serious that she attempted to obtain Dr. Sharp's telephone number and call him herself. Markin stopped her, instructed her to return to her station and advised Carlson that she, Markin, would make the judgment as to when it was necessary to summon a physician.

During the trial, Dr. Sharp, Holston's surgeon and treating physician, stated that at 5 p.m., the individual readings of Holston's vital signs as reflected in the medical chart could be considered normal. However, he acknowledged that the nurse at the bedside would be in the best position to interpret the patient's condition, based on the trend of increasing pulse rate and CVP. Dr. Sharp testified that he should have been notified of Holston's condition no later than 5 p.m., and if he had been notified then, he would have had sufficient time to properly diagnose and treat the tamponade before the condition became irreversible.

By 6 p.m., Holston's pulse had reached 150 and her blood pressure was starting to fall. Carlson testified that she told Markin at that time that if she did not summon assistance immediately she would have a dead patient on her hands. Markin then called an intern or resident, who arrived within approximately 15 minutes.

Carlson testified that at 6:20 p.m., Holston was slow to respond to directions and could barely open her eyes and squeeze Carlson's hand. She could speak in a whisper, and asked what was happening to her. She looked extremely anxious. Carlson tried to calm her but related that there was a problem with her blood pressure.

A cardiologist, Dr. Paul Maxwell, also was summoned to Holston's room at approximately 6:20 p.m. Dr. Sharp, Holston's treating physician, arrived at 6:43. By this time, Holston apparently had lost her blood pressure. Dr. Sharp ordered emergency surgery for Holston,

at approximately 6:50 p.m.. As Holston was being wheeled out to surgery in her hospital bed, Carlson spoke to her patient about the upcoming surgery and mentioned that there was fluid in her chest. According to Carlson, Holston "said 'okay' basically."

In the operating room, a slash was made to Holston's chest and, because of the extreme emergency, anesthetic was not used. However, Dr. Sharp testified regarding his belief that she was unconscious during the surgery and would not have been able to respond to pain at that time.

The operation lasted approximately two hours. Initially, Dr. Sharp believed that Holston was suffering from internal bleeding related to the earlier gastric bypass procedure. During an exploratory laparotomy, Holston's heart stopped beating for several minutes. Dr. Sharp immediately performed an emergency left thoracotomy, during which he discovered that Holston was suffering from cardiac tamponade and that her pericardial sac was filled with fluid. Dr. Sharp nicked Holston's pericardial sac to release the fluid. Holston suffered brain damage as a result of the tamponade and never regained consciousness following the surgery.

When Carlson next saw Holston at 9 p.m., the patient was in a coma. She died approximately one week later.

Dr. Alden, an expert in gastric bypass surgery, testified that the cause of Holston's death and brain damage was pericardial tamponade resulting from a perforation of the right atrium of the heart by an improperly positioned catheter. In Dr. Alden's opinion, the perforation had occurred by 4 p.m. or earlier because the patient's vital signs began to change at that time. According to Dr. Alden, the hospital deviated from the standard of care for diagnosing and treating cardiac tamponade in the case at bar.

Dr. Frank Edward Robbins, Jr., an anesthesiologist, testified that the catheter placement was not within the standard of practice because a chest X ray was not obtained to check and correct the placement. Proper procedure would have been to place the tip of the catheter into the superior vena cava, above the pericardial sac, and then to confirm the placement by an X ray of the patient's chest.

Dr. Alden testified that a doctor should have been called to Holston's bedside at 5 p.m. because of the changes in the patient's condition. In Dr. Alden's opinion, the diagnosis of cardiac tamponade could have been made at that time. Dr. Maxwell, the cardiologist who had been called in at 6:20 p.m., agreed that plaintiff's surgeon should have been called at 5 p.m., under the facts of the case. Another of plaintiffs' expert witnesses, Jeff Beicher, who was a nurse with extensive training and experience, testified that St. Anthony's deviated from accepted standards of medical practice by failing to notify a doctor of Holston's condition at 5 p.m., by which time the pattern of increasing heart rate and drop in urinary output signalled a serious problem.

By 6 p.m., the seriousness of Holston's condition was clear. According to Dr. Alden, when physicians began arriving, at 6:15 or 6:20 p.m., the correct diagnosis should have been made because the most likely diagnosis was pericardial tamponade, based on the symptoms. However, neither the surgeon nor the cardiologist made the correct diagnosis. According to Dr. Alden, their failure to make the diagnosis was a deviation from standard practice. Dr. Alden testified that available tests to assist in diagnosing cardiac tamponade include taking a chest X ray and, if there were sufficient time, an echocardiogram, which would reveal whether there was fluid around the heart. In addition, a procedure called pericardiocentesis would have assisted in both the diagnosis

and treatment of the tamponade. Pericardiocentesis consists of inserting a needle into the patient's chest to determine if fluid in the pericardial sac is present. If so, the needle would be used to continue withdrawing fluid, thereby relieving the cardiac tamponade.

Dr. Alden, as well as Holston's surgeon, Dr. Sharp, and the cardiologist, Dr. Maxwell, agreed that early detection of a tamponade is important to successfully treat the condition.

Dr. Arends, the anesthesiologist who had placed the catheter, testified that in January 1978 atrial perforation and cardiac tamponade were known risks associated with the use of a CVP catheter and that he was aware that there was a risk of atrial perforation when he attended to Holston. However, he stated that the risk was infinitesimal. He did not order a chest X ray of Holston to determine the placement of the CVP line.

Following the death of Holston, plaintiffs filed suit against several defendants, alleging various theories of liability including products liability and negligence. During trial, plaintiffs settled their claims against all defendants except St. Anthony. The jury returned its verdict against St. Anthony, awarding plaintiffs approximately $6.2 million in compensation for the wrongful death of Holston and awarding Holston's estate approximately $1 million, representing the pain and suffering and disability and disfigurement she suffered before her death. The appellate court affirmed. 247 Ill. App. 3d 985.

In this court, defendant argues that it should receive a new trial on the following bases: (1) Dr. Alden's trial opinion violated Supreme Court Rule 220 because it differed from or supplemented his deposition testimony regarding the hospital's standard of care; (2) nurse Burns, defendant's proposed expert on the nursing standard of care, should have been permitted to give her

expert opinion at trial; (3) the trial court should have granted defendant's midtrial motion to transfer venue, following the dismissal from the lawsuit of the sole Cook County defendant; (4) Holston's pain and suffering and disability and disfigurement were improper elements of damages in light of her failure to regain consciousness; (5) the trial court erred in denying defendant's attempt to present, in mitigation of the loss of consortium damages, the fact that decedent had been separated from her husband for a few months, $1^{1}/_{2}$ years before her death; and (6) the verdict was excessive, suggesting passion or prejudice on the part of the jury.

## ANALYSIS

### I

Defendant argues that the opinion testimony of plaintiffs' expert, Dr. Alden, violated the disclosure requirements of Supreme Court Rule 220 (134 Ill. 2d R. 220) and resulted in prejudicial error. Defendant claims that Dr. Alden's criticism of the hospital and nursing staff at trial deviated from his deposition testimony and therefore should be considered a "new" or "amplified" opinion subject to pretrial disclosure. According to defendant, plaintiffs' counsel admitted at trial that Dr. Alden had not criticized defendant or its nursing staff during his deposition. At trial, however, Dr. Alden testified that defendant had failed to conform to the proper standard of nursing care and hospital practice because the nurses did not notify a doctor of the patient's condition at 5 p.m.

Defendant contends that Dr. Alden's trial testimony was predicated on discovery material given to him for the first time at trial, *viz.*, the court reporter's transcript of nurse Carlson's 1983 discovery deposition. Defendant argues that Dr. Alden's new opinion at trial violated both Rule 220(c)(3), which provides that a party must

"seasonably supplement" his answers to Rule 220 inter-rogatories "as additional information becomes known to the party or his counsel," and Rule 220(d), which gener-ally limits the trial testimony of expert witnesses to the "facts known or opinions disclosed in such discovery proceedings."

Plaintiffs dispute defendant's characterization of the facts, insisting that Dr. Alden's deposition opinion and trial opinion were consistent on the ultimate issue of the nursing staff's negligence. Plaintiffs quote excerpts from the record which indicate that Dr. Alden had expressed the opinion, in his deposition, that it was negligent for the nursing staff not to call a physician when the nurse attending the patient determined that a doctor should be called. Moreover, plaintiffs state that during the deposition of Dr. Alden, most of the ques-tions relating to the hospital's negligence related to the patient's medical chart, which did not reflect nurse Carl-son's expressed concerns as to the patient's deteriorat-ing condition or Carlson's requests to the supervising nurse to notify a doctor. However, Dr. Alden was aware of the general nature of nurse Carlson's discovery depo-sition when he gave his own deposition. Plaintiffs contend that Dr. Alden's trial testimony, to the extent it relied in part on nurse Carlson's deposition transcript, was not inconsistent with his deposition criticisms of the nursing staff and was not a "new" opinion of the type which might take defendant by surprise. Therefore, plaintiffs contend, the fact that Dr. Alden did not read the actual transcript of Carlson's discovery deposition until trial is immaterial.

Supreme Court Rule 220 was intended to establish a framework for the timely revelation of the identity of expert witnesses and the substance of their testimony, so as not to surprise or otherwise prejudice the opposing party at trial. (See *Sohaey v. Van Cura* (1994), 158 Ill. 2d

375, 381-82.) Even if a technical violation of Rule 220 exists, the trial court retains discretion in its ruling as to the admissibility of the expert's evidence. (*Sohaey*, 158 Ill. 2d at 382.) The party claiming a Rule 220 violation must establish by the record that such a violation occurred (see *Stennis v. Rekkas* (1992), 233 Ill. App. 3d 813), and on review, the appellant has the burden of presenting the court with an adequate record regarding the claimed error (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92).

In the instant case, the appellate court observed that Dr. Alden's deposition transcript was not part of the appellate record and therefore the record was "not adequate to determine whether the expert testified to new opinions at trial" (247 Ill. App. 3d at 996). Defendant criticizes the appellate court's failure to reach the "merits" of its Rule 220 argument, arguing that failing to rule on the issue "will encourage mid-trial supplementation of expert witnesses' opinions."

Our review of the extensive record in this case yields scant support for defendant's claim that Dr. Alden substantively changed or supplemented his opinion in a manner inconsistent with Rule 220. The record contains excerpts from Dr. Alden's 1986 deposition, read into the report of proceedings, in which Dr. Alden stated that the supervising nurse erred in overriding the attending nurse's desire to notify a physician regarding Holston's deteriorating condition. Dr. Alden answered in the affirmative when, in his deposition, he was asked whether it was a deviation from the standard of care for one nurse to prevent another nurse from notifying a doctor in such a situation. These excerpts from Dr. Alden's deposition were offered at trial in response to defense counsel's attempt to elicit from Dr. Alden an admission that Dr. Alden had offered *no* criticism of the nursing staff or hospital in his deposition, at least based on the face of

the patient's hospital chart. Accordingly, we reject defendant's contention that Dr. Alden's trial testimony was the first instance in which he was critical of the nursing staff's failure to summon a doctor when the nurse who attended the patient believed it to be necessary.

Defendant further argues that Dr. Alden had not been identified as an expert retained to testify against the hospital until after the trial had begun. However, this contention is belied by the fact that Dr. Alden, who had given his deposition $1^1/2$ years before trial, was identified in *defendant's* pretrial motion *in limine* as one of several experts whom plaintiffs had retained to testify at trial as to the standard of nursing care. In its motion to limit the number of plaintiffs' expert witnesses, defendant named Dr. Alden, among others, as witnesses who had, in discovery, voiced "the common criticism that the nurses failed to properly monitor and report Theodora Holston's changing vital signs to a physician." This statement admits defendant's awareness of both the identity of Dr. Alden as an expert and the substance of Dr. Alden's opinion. Accordingly, we reject defendant's assertion that Dr. Alden rendered a new or unfairly surprising opinion at trial regarding the hospital's standard of care.

Defendant contends that plaintiffs additionally circumvented the requirements of Rule 220 when Dr. Alden was permitted to supplement his opinion of the nursing care and hospital practice based on new information provided at trial by a party. The facts relevant to this issue are as follows. Contemporaneous with the beginning of trial, Dr. Maxwell, one of the codefendants, revealed a change in his proposed trial testimony. Dr. Maxwell was the cardiologist summoned to the hospital in the wake of the nursing staff's discovery that Holston needed immediate attention. It appears that Dr. Max-

well had given a deposition during discovery in which he recalled being summoned to the hospital sometime "around 5:00 or 6:00." Just before opening statements at trial, Dr. Maxwell notified the others that his previous estimate was in error and that he had not arrived at the hospital until approximately 6:20. This change in the chronology was significant to the extent that it strengthened plaintiffs' claim that the nursing staff unduly delayed notifying a physician of Holston's deteriorating condition. In apprising the court of the need for Dr. Alden to revise his opinion in light of this party admission, plaintiffs' counsel informed the court, "If that is the testimony [of Dr. Maxwell], I want to inform [defendant's counsel] that Dr. Alden may have an *additional* criticism against the hospital." (Emphasis added.)

Defendant characterizes the above statement of plaintiffs' counsel as an admission that Dr. Alden's testimony at trial involved new or supplemental matters not previously disclosed to defendant. Defendant describes as a "mere pretext" plaintiffs' use of Dr. Maxwell's corrected statement to improperly broaden Dr. Alden's opinion regarding the hospital's compliance with the standard of care. Defendant complains, "If plaintiffs wished to have their expert rely on this new information, plaintiffs were required to seasonably supplement the opinions of their expert prior to the commencement of trial in order to comply with Supreme Court Rule 220(c)."

We do not read Rule 220(c) as requiring parties who are in the midst of trial to mechanically supplement answers to interrogatories under circumstances similar to those present in the case at bar. Plaintiffs were not in control of Dr. Maxwell, who was a party defendant when he corrected his estimate of the time he was summoned to the hospital. Defendant had equal access to Dr.

Maxwell's information and any surprise caused by Dr. Maxwell's revelation on the eve of trial is not attributable to plaintiffs. See *Costa v. Dresser Industries, Inc.* (1994), 268 Ill. App. 3d 1 (rejecting claim that defendant violated Rule 220(c)(3) by failing to supplement discovery answers and noting that plaintiff was not surprised by defendant's expert witness).

Defendant also asserts that Dr. Alden's testimony violated Rule 220(d), which provides that an expert's testimony at trial should not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in discovery. (See *Marshall v. Taylor-Wharton Co.* (1992), 234 Ill. App. 3d 596, 612 (purpose of "the scope limitation of Rule 220(d) is to allow parties to prepare for trial based on the disclosures made during discovery"); see also *Flores v. Cyborski* (1993), 257 Ill. App. 3d 119, 134 (affirming denial of motion to bar expert's trial testimony because expert's testimony at trial was not beyond the fair scope of his deposition testimony).) Although it is true that a party's expert should not be permitted to defeat the goals of discovery by springing on the opponent new opinions or by relying on previously undisclosed bases for an opinion at trial, we do not believe that the trial court in the instant case erred in permitting Dr. Alden to incorporate into his opinion the underlying evidentiary fact of Dr. Maxwell's actual arrival time at the hospital. Even assuming that this new information caused Dr. Alden's testimony to technically exceed the scope of opinions expressed in his discovery deposition, Rule 220 does not mandate a rigid or hypertechnical approach to the disclosure and admission of expert opinion evidence when the realities of trial diverge from the anticipations of discovery. At the time Dr. Alden gave his deposition, he did not have the benefit of Dr. Maxwell's revised estimate of the time he reached the hospital.

Therefore, we reject as untenable defendant's assertion that plaintiffs violated Rule 220 for failing to supplement discovery answers based on Dr. Maxwell's revelation at trial.

Many of the evidentiary rulings that trial courts make in the course of trial cannot be anticipated in advance of the actual presentation of evidence. A Rule 220(d) challenge to the scope of an expert's trial opinion may require the court to evaluate unanticipated developments such as a witness' changed recollection of the facts upon which an expert opinion is rendered. A trial court has familiarity with the circumstances in which a particular objection is made and must respond to emerging evidentiary challenges as the trial unfolds. If the trial court determines that the challenged evidence gives rise to a new or supplemental opinion that may prejudice a party, the court may, in the exercise of its sound discretion, grant a continuance to permit the witness to be deposed (see *Kosinski v. Inland Steel Co.* (1989), 192 Ill. App. 3d 1017, 1027), grant a motion to exclude the evidence (see *Department of Transportation v. White* (1994), 264 Ill. App. 3d 145), or take whatever other steps may be necessary to ensure a fair trial (see *Bank of Illinois v. Thweatt* (1994), 258 Ill. App. 3d 349, 359-60 (affirming the trial court's rulings that the challenged testimony of one of defendant's expert witnesses was within the scope of the Rule 220 disclosure while the testimony of another expert witness was not)).

The appellate record in the case at bar consists of approximately 7,000 pages, which includes hundreds of pages of pleadings, discovery material and motions. The transcript is replete with examples of the myriad issues raised by the parties and the thorough consideration given to those issues by the trial judge. Defendant's assertion that Dr. Alden was improperly allowed to exceed the scope of his disclosed opinion, to the surprise and

prejudice of defendant, is unpersuasive and lacks factual support in the record.

We conclude that defendant has failed to establish either a violation of Rule 220 in the case at bar or an abuse of discretion in the rulings of the trial court with respect to Dr. Alden's testimony.

## II

Defendant also argues that the trial court committed reversible error when the court refused to permit one of defendant's employees, nurse Susan Burns, to render an expert opinion regarding defendant's compliance with the nursing standard of care. According to defendant, nurse Burns' expert opinion was needed to rebut Dr. Alden's "additional" opinions, based on the "new" information regarding defendant's deviation from the standard of nursing care. The appellate court stated that although the exclusion of nurse Burns' testimony was error, the error was harmless and unlikely to have affected the outcome of the trial.

Plaintiffs contend that the trial court's ruling was correct, particularly in light of the circumstances under which the belated expert opinion evidence of nurse Burns was offered. In its pretrial motion to limit plaintiffs' experts, defendant announced that it had "retained William Brice Buckingham, M.D., as [defendant's] expert witness, and will rely exclusively upon his independent expert medical testimony in the defense of this trial." In fact, defendant did not call Dr. Buckingham to testify and did not disclose any other Rule 220 experts who would testify regarding the standard of nursing care. Instead, defendant sought the admission of nurse Burns' expert opinion on the ground that she was a treating nurse who was exempt from Rule 220's requirement that retained experts be disclosed in advance of trial.

The record indicates that defendant did not identify

nurse Burns as an expert retained for trial, pursuant to Rule 220 interrogatories, but instead listed her with the more than 40 other hospital employees who were characterized as having knowledge of the patient's medical condition or treatment. In *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, 549, this court noted, "If the expert is intimately involved in the underlying facts giving rise to the litigation and he would reasonably be expected to form an opinion through that involvement, then disclosure is not required. *** On the other hand, where the expert's contact with the case is slight, or where the opinion rendered is unrelated to the expert's involvement in the case, then disclosure is required." (See also *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 231.) The trial court in the case at bar ruled that nurse Burns, the head nurse of the intensive care department, could render an expert opinion, despite the lack of her prior disclosure as an expert, but only if defendant could establish her status as a treating nurse whose opinion was based on actual knowledge gained from her involvement in the patient's care during the relevant time period. However, defendant failed to establish the necessary foundation. Nurse Burns was not actually involved in the post-operative care of Holston and in fact was off duty during the times relevant to the alleged negligence of the nursing staff. Nurse Burns did not arrive at the patient's bedside until approximately 6:40 p.m., after Holston had "coded," or lost her blood pressure. At that time the doctors were preparing to rush the patient into the operating room for emergency surgery. Nurse Burns' brief contact with Holston was not predicated on personal involvement in the patient's care or direct knowledge of the nursing care which preceded the emergency situation. Accordingly, nurse Burns lacked the requisite familiarity with the patient's care that would

have established the necessary foundation for her to give an expert opinion based on her status as a treating nurse to the patient. We hold that the trial court did not abuse its discretion in excluding Burns' expert opinion.

The subject matter of Burns' proffered opinion was that, based solely on the nurses' notes in Holston's hospital chart between 4 and 5 p.m., accepted standards of nursing practice did not require a doctor to be called at 5 p.m. Plaintiffs note, however, that three other witnesses, Dr. Alden, Dr. Maxwell, and Dr. Sharp, had already testified to the same conclusion, *i.e.*, if the pertinent inquiry were limited to the face of the (incomplete) chart alone, no deviation from the nursing standard of care would be established based on the nurses' failure to call a doctor at 5 p.m. In the offer of proof, nurse Burns simply reiterated that point. She was not asked to render an opinion which would include all of the relevant facts in evidence, such as the testimony from nurse Carlson that Holston's vital signs revealed an alarming trend or pattern which corresponded to the deteriorating condition of the patient. Therefore, plaintiffs contend, even if nurse Burns' proffered opinion was wrongly excluded, defendant has failed to establish material prejudice. See *Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549 (if testimony of an expert is cumulative of other testimony, exclusion of such evidence, if error, is harmless); *Leary v. Eng* (1991), 214 Ill. App. 3d 279 (judgment should not be reversed on the basis of evidentiary rulings unless record indicates existence of substantial prejudice affecting outcome of trial).

Based on the record in the instant case, we conclude that the trial court did not abuse its discretion in excluding nurse Burns' opinion that the nursing staff complied with the proper standard of care. This opinion was based

solely on her review of an incomplete medical chart. Nor do we believe that the contents of the offer of proof regarding nurse Burns' testimony would have affected the outcome of the case. As noted, the proof relevant to the hospital's negligence was not limited to the presence or absence of nurses' notes in the patient's charts from 4 p.m. to 5 p.m. Each witness who testified regarding the nursing care given the patient agreed that, based on nurse Carlson's testimony and her nursing judgment regarding the alarming trend in Holston's vital signs, a doctor should have been summoned by 5 p.m. Even nurse Burns testified, under questioning by defendant regarding the policies and procedures of the hospital in 1978, that if a nurse believed there was a problem with a patient she or he was *required* to notify a physician. Accordingly, it was undisputed in the evidence that if the attending nurse believed it necessary for a doctor to be notified of Holston's condition, there was an obligation on the part of the nursing staff to summon a doctor. Therefore, Burns' opinion or interpretation of the patient's incomplete medical chart would have added little to the jury's understanding of the facts or issues.

We conclude that defendant was not materially prejudiced by the preclusion from evidence of this one aspect of nurse Burns' proposed testimony. Nurse Burns was allowed to testify regarding hospital procedures, "nursing judgment," and the requirements of charting a patient's condition. She testified regarding her limited and brief contact with Holston. We decline to reverse the judgment based on the exclusion of the opinion testimony of nurse Burns.

## III

Defendant contends that the trial court erred in denying its midtrial motion for transfer of venue. Defendant moved for mistrial and transfer of venue after plaintiffs settled with and agreed to dismiss C.R. Bard,

Inc., the sole "venue defendant." Defendant suggests that Bard was not joined in good faith and argues that once Bard was dismissed from the suit, venue should have been transferred to a proper forum because the remaining parties and most witnesses were from Winnebago County.

We reject defendant's argument that it was entitled to a change of venue in the middle of a complex trial involving numerous parties and issues. At the time the lawsuit was filed, Bard, the manufacturer of the catheter in issue, was joined in plaintiffs' action pursuant to products liability theories, including design defect and whether there was a duty to warn users of the possible risks of puncturing the cardiac wall. According to plaintiffs, at the time the suit was filed, they had been unable to ascertain from hospital records which of seven possible manufacturers had made the catheter in issue. According to plaintiffs, of the seven manufacturers originally named, four had a venue connection with Cook County. After taking discovery, over a period of two years, plaintiffs dismissed the other manufacturers. Bard, one of the manufacturers with a Cook County venue connection, remained in the lawsuit throughout discovery and until its dismissal during the trial.

The trial court in the instant case noted that if Bard had been dismissed before the jury selection had begun, the court would "look at [the venue issue] in a different light." However, defendant did not offer a persuasive reason to terminate weeks of trial proceedings and begin them anew in a different county. Many of the witnesses had already testified at the time the motion to transfer was made. The sole basis for the motion to transfer was that Bard was not joined "in good faith and with probable cause for the purpose of obtaining a judgment" against it, rather than for the purpose of fixing venue. (See 735 ILCS 5/2—101 (West 1992).) We note that under

the venue provisions, no order or judgment is void for having been rendered in the wrong venue. (735 ILCS 5/2—104(a).) Defendant cites no case decision in which a trial court was found to have abused its discretion in failing to grant a midtrial motion for transfer of venue. The trial court in the case at bar did not make a finding of bad-faith joinder, and we are aware of no basis in the record for such finding. Accordingly, we affirm the trial court's ruling on this issue.

## IV

Defendant next challenges, as speculative, the jury's award of damages for pain and suffering and for disability and disfigurement. Defendant claims that most or all of the pain that Holston felt following her abdominal surgery was the expected discomfort following such surgery, and thus not compensable as being caused by defendant's negligence. After Holston lost consciousness, according to defendant, she could feel no further pain. Similarly, she was unable to appreciate her diminished brain functioning and disfigurement. Therefore, defendant argues, the jury's award of damages to Holston for her conscious pain and suffering and for disability and disfigurement was based on speculation.

The appellate court in the case at bar stated that "the reasonable inference from the evidence of increasing pressure on the heart, rising pulse rate, and declining blood pressure was that decedent suffered more than she would have in a normal post-operative course. An award for decedent's suffering was appropriate." (247 Ill. App. 3d at 1002.) We agree. The issue of Holston's physical pain and accompanying mental anguish was not limited to the period of time in which she may have lapsed into unconsciousness while she was receiving open heart surgery without an anesthetic. The evidence of her pain and suffering includes the time preceding the emergency surgery, when the pressure on her heart

and respiratory system caused by the cardiac tamponade was building. Nurse Carlson's testimony indicates that, hours before the emergency surgery, Holston was conscious and sought reassurance when Carlson kept leaving her bedside to confer with nurse Markin. Later, as the effects of the tamponade were plainly manifested and the doctors finally summoned, Holston was able to observe their concern. Nurse Carlson spoke with her patient to calm her, but did mention the fluids in her chest and the need for immediate surgery. Holston appeared anxious to nurse Carlson, who testified that as the patient was being wheeled into surgery she was still conscious. Nurse Carlson's testimony supports the inference that Holston was in an acute state of suffering, both physically and mentally.

Although Dr. Sharp testified as to his belief that Holston would not have felt the pain of the emergency surgery because she had lapsed into unconsciousness, the jury was not required to disregard the other, ample evidence of Holston's pain and suffering. The patient had a misplaced catheter piercing her heart. She suffered an accelerating heart rate and dropping blood pressure as a direct result of the fluids leaking into her pericardial sac. The jury could infer that the cardiac tamponade aggravated her pain and suffering. The extra burden placed on her heart because of the tamponade built over a period of hours, until at 6:20 p.m. her heart was pumping at the rate of 166 beats per minute. Even at this pace, her heart could not overcome the crushing pressure of the fluid which was compressing it. She required more oxygen in her body's attempt to sustain life and she was given an oxygen mask. The jury could have inferred, contrary to defendant's characterization of her suffering, that Holston's pain was not merely the result of normal post-operative recovery for the gastric bypass surgery. We conclude that the jury properly

considered Holston's pain and suffering in assessing damages. *E.g., Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 116 (damages award for pain and suffering is proper where there is evidence of a physical injury); see also *Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 101 (photographs of crushed car were admissible as circumstantial evidence bearing on the extent of decedent's conscious pain and suffering during half hour period following crash).

For similar reasons we reject defendant's challenge to the issue of damages for Holston's disability and disfigurement. Physical "disability" is defined as "[a]bsence of competent physical, intellectual, or moral powers; *** incapacity caused by physical defect or infirmity." (Black's Law Dictionary 461 (6th ed. 1990); see *Morescki v. Leuschke* (1991), 217 Ill. App. 3d 456, 459.) The term "disfigure" means "to make less complete, perfect, or beautiful in appearance or character." (Webster's Third New International Dictionary 649 (1986).) The evidence of record indicates that if the tamponade had been diagnosed earlier it could have been corrected by the relatively simple procedure of inserting a hypodermic needle into the pericardial sac. Because of the delay, Holston required emergency surgery which was accompanied by large surgical slashes to her body. She suffered extensive brain damage as well. Accordingly, there was evidence in the record that Holston suffered both disability and disfigurement as a result of the undetected cardiac tamponade. We conclude that the trial court did not err in permitting the jury to consider Holston's disability and disfigurement in making its award of damages. See, *e.g., Henry v. St. John's Hospital* (1987), 159 Ill. App. 3d 725 (upholding $10 million verdict for infant born with severe mental retardation as a result of medical procedure); *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill.

App. 3d 458 (upholding $800,000 in survival damages awarded to victim who remained in a coma for four months before death).

## V

Defendant further challenges the damages awarded for loss of consortium. According to defendant, the trial court erred in precluding it from offering evidence that Holston and her husband informally separated for a period of four to six months approximately $1^1/_2$ years before her death. Defendant asserts that it should have been allowed to introduce into evidence the fact of the couple's separation.

The record reveals that the trial court granted plaintiffs' motion *in limine* to bar reference to the separation period but also told defendant that if plaintiffs attempted to portray the marriage inaccurately, defendant could reopen the inquiry into the admissibility of the separation. Defendant did not ask the court to reconsider its ruling following plaintiffs' evidence as to the 12-year marriage of the Holstons.

The trial judge was in the best position to evaluate the relevance of the evidence presented on the issue of the Holstons' marital relationship. It appears that defendant was unable to persuade the court that the brief separation period had any significant or lasting impact on the marriage. Courts retain broad discretion in making evidentiary rulings at trial and therefore may properly exclude evidence of limited probative value. (See *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458 (in considering loss of consortium claim, asserted misbehavior of decedent held irrelevant where there was no evidence that the marriage was affected thereby); *cf. Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384 (holding that evidence of decedent's marital infidelity should have been admitted to demonstrate a diminishment in the value of

consortium claim).) We find no abuse of discretion in the trial court's ruling.

## VI

Finally, defendant argues that the $7.3 million verdict is against the manifest weight of the evidence, resulted from passion and prejudice, and is excessive as a matter of law. We disagree.

The jury awarded plaintiffs approximately $6.2 million in damages upon the wrongful death claims and approximately $1 million as Holston's compensatory damages in the survival action for her pain and suffering and disability and disfigurement. With respect to the verdict awarded to Holston's estate on the survival action, defendant repeats its contention that there was no evidence offered in support of Holston's pain and suffering and disability and disfigurement. We have addressed that contention elsewhere in this opinion and need not further discuss it.

Of the $6.2 million awarded for wrongful death damages, Holston's husband was awarded $1.2 million and the two children were awarded $5 million. Defendant challenges the amount awarded on the ground that Holston's husband and two children, who were aged 8 and 12 when their 29-year-old mother died, were overcompensated for their loss. According to defendant, the wrongful death verdict "patently exceeds the flexible limits of fair and reasonable compensation and is so large as to shock the conscience of the court."

We disagree. Defendant fails to establish a sound basis upon which this court may conclude that the verdict was excessive or procured by "passion and prejudice." Instead, defendant cites to the immaterial fact that its codefendants settled with plaintiffs for sums less than the amount the jury assessed against defendant. We reject defendant's suggestion that jury prejudice may be inferred from a comparison between the amount

of a verdict against one party and the sums paid by settling defendants to resolve their respective roles in the litigation.

For the reasons set forth, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE HEIPLE, dissenting:

Once again, this court indicates both an inability to recognize an excessive verdict and an unwillingness to consider any mechanism to deal with the problem. Of course, in defense of the majority, it must be said that if there can never be an excessive verdict, there can never be an excessive verdict problem. This, however, is an evasion of reality and an abdication of judicial responsibility.

As an aid to understanding, I recite the essential facts. Decedent, a nurse by training, died from complications arising from gastric bypass surgery performed in a weight-reduction operation. At the time of her death, she was 29 years old and was being paid $6 per hour. She was survived by a husband of 12 years and two children, aged 8 and 12. These plaintiffs first obtained a voluntary settlement with other defendants for $2.7 million, after which an additional $7.3 million was gained by a jury verdict against the defendant hospital.

The combined settlement and verdicts total $10 million. Deducting the customary one-third fee for the lawyer of $3.33 million, decedent's husband and two children are left with $6.67 million, tax free. That sum, invested at 5%, would produce an annual income of $333,350 per year throughout the 50-year life expectancy of the decedent, with the principal left intact. Even when divided between the husband and children, the survivors have a sum of money which, if invested properly, will place them among the highest strata of income earners in our country.

The jury verdict, broken down, was as follows: $600,000 for decedent's pain and suffering; $400,000 for her disability and disfigurement; $1.2 million for her husband's loss of consortium; $5 million for her children's loss of society; and $100,000 for the loss of money suffered by the surviving husband and children. It should further be noted that the $400,000 disability and disfigurement award was given notwithstanding that decedent was unconscious at the time of the disfigurement and never regained consciousness before her death. It need hardly be stated that one who is unconscious at the time of disfigurement and who never regains consciousness cannot have a compensable injury for disfigurement. Yet, it is exactly this illogical precedent that the majority today sets forth.

Through the years, this court has repeatedly paid lip service to the responsibility courts have to carefully scrutinize the record to determine whether the amount of a verdict is so large as to indicate that it is the result of prejudice or passion. (See *Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 470, 476-80 (Heiple, J., dissenting); *Drews v. Gobel Freight Lines, Inc.* (1991), 144 Ill. 2d 84, 97-98, 105-07 (Heiple, J., dissenting); *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 437; *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 473; *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 453.) As in the case at hand, courts sometimes refer to a "shock the conscience" standard in determining whether verdicts are excessive. (See 165 Ill. 2d at 177; *Wagner v. City of Chicago* (1993), 254 Ill. App. 3d 842; *Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329.) However, such soporific language, devoid of any method or mechanism for determining whether a verdict is excessive, is analytically useless. It has led the courts of this State to give juries *carte blanche* in assess-

ing damages for noneconomic injuries. Indeed, my research has failed to disclose a single case where this court has found a multimillion dollar verdict for noneconomic damages to be either the result of prejudice or passion or a shock to its judicial conscience. From this it can only be concluded that no jury verdict can ever be excessive in Illinois.

That this is a sad case is inarguable. A young mother loses her life due to medical malpractice and leaves behind a surviving husband and two young children. Only a person with a heart of stone could fail to feel sorry for these people. Since the law cannot bring back the life of a young mother, it mandates compensation for the victims from those who caused the loss. That is both fair and reasonable. This compensation, however, cannot be limitless. As was so cogently stated by the Supreme Court of West Virginia in the case of a child's death, "if the measure of damages were the value of a human life then, arguably, no jury verdict could be excessive. *** Counsel's suggestion that the [family] would not have traded [the child's] life for $10,000,000 is entirely accurate—but they would also not have traded [the child's] life for $100,000,000 or even a $1,000,000,000." *Roberts v. Stevens Clinic Hospital, Inc.* (1986), 176 W. Va. 492, 500, 345 S.E.2d 791, 800.

I do not dispute the proposition that an injured plaintiff should be well and fairly compensated by a negligent defendant. Nor do I dispute the proposition that lawyers are entitled to be paid for services rendered. What I do seriously question is a sky's the limit approach to jury verdicts. What is needed here is a rule of reason and a mechanism for assessing the legitimacy of an award.

For the reasons given, I respectfully dissent.