340 S.C. 158 (2000)
530 S.E.2d 389
Lance SCOTT, deceased by and through his Personal Representative, Lynn SCOTT, Respondent,
v.
Jan PORTER, M.D., Richard Bannon, M.D. and Foothills Family Medicine Center, P.A., of whom Jan Porter, M.D. and Foothills Family Medicine Center, P.A. are, Appellants.
No. 3149.
Court of Appeals of South Carolina.
Heard February 10, 2000.
Decided April 10, 2000.
Rehearing Denied May 27, 2000.
*162 Harold W. Jacobs, of Nexsen, Pruet, Jacobs & Pollard, of Columbia; Ashby W. Davis and Steven A. Snyder, both of Donnan, Morton, Davis & Snyder, of Greenville, for appellants.
Michael E. Spears, of Spears & Howell; Gerald G. Wilson; and Rodman C. Tullis, all of Spartanburg, for respondent.
HEARN, Chief Judge:
Jan Porter, M.D. (Porter) and Foothills Family Medicine Center, P.A. appeal from a jury verdict finding Porter negligent in the death of her patient, 19-month old Lance Scott. The jury awarded Lynn Scott, Lance's mother and Personal Representative, six hundred thousand dollars in actual damages and 1.5 million dollars in punitive damages in the survival action, and 1.5 million dollars in actual damages and two million in punitive damages in the wrongful death action. Porter raises two issues on appeal: 1) that the verdict should be reversed because of an alleged inflammatory closing argument; and 2) that the damages awarded were the result of passion, partiality, and prejudice. We affirm.

FACTS
In December 1992, Lance Scott, then fourteen months old, experienced two febrile seizures.[1] A CAT scan and EEG performed on Lance revealed no abnormality. After being discharged, Lynn took Lance to a follow-up appointment with a neurologist. The neurologist examined Lance and concluded he was fine. Lance had no significant medical problems until June of 1993.
*163 On the morning of June 2, 1993, Lance again had a seizure. Lynn accompanied Lance to Mary Black Hospital in an ambulance. At the hospital, Lance became nauseated and threw up several times in the x-ray room. Lab tests revealed Lance's serum sodium level was in the low range. In contrast to the December seizures, these were not the result of a fever. Finding no cause for the seizures, the hospital released Lance and arranged for him to see Dr. Porter in her office that afternoon.
At Dr. Porter's office, Lance went into another seizure. When the seizure did not appear to be subsiding on its own, Porter administered medication to stop it and decided to admit Lance to Spartanburg Regional Hospital.
At Spartanburg Regional Lance was given an IV of one quarter normal saline at 10 ccs an hour per Porter's orders. Spartanburg Regional repeated the same lab work performed earlier in the day at Mary Black Hospital. These tests also revealed Lance's sodium level was low. However, Porter did not believe Lance's low sodium levels were clinically significant.
In the IV room at Spartanburg Regional, Lance had another seizure. The hospital called Porter who approved an antiseizure drug to be added to Lance's IV. Porter then increased Lance's IV fluid rate to 40 ccs an hour. On its own initiative, the nursing staff at the hospital placed Lance on an apnea bradycardia (AB) monitor which would alert the staff if Lance stopped breathing during a seizure.
Lance did not have any more seizures after approximately 7:00 p.m. However, Lance whined and became restless, pulling at his monitors, sheets and bed. Toward morning Lance was combative and unconsolable. He fought Lynn when she tried to hold him. At some point Lance stated "Mommy, I no feel good. Hold me."
Lynn summoned the nurses and told them she was worried about Lance's behavior and thought he might be on the verge of having another seizure. The nurse assured her Lance's behavior was normal. When Porter arrived to see Lance around 8:30 a.m., Lance did not seem to recognize his mother. Lynn asked if the medicine could be causing Lance's uncharacteristic combative behavior. Porter indicated it could and *164 informed Lynn that Lance would be sent down for a CAT scan sometime that morning and they would know more after that. A student nurse and transport technician later arrived and took Lance for an EEG and CAT scan around 9:15 a.m. Before Lance left the room, the nurses disconnected his AB monitor.
While in the CAT scanner, Lance stopped breathing. Emergency room pediatrician Dr. Lucy Foxworth ran to the CAT scanner, intubated Lance, and put him on a ventilator. Foxworth ordered an arterial blood gas test. When it came back, it also listed Lance's sodium level as unusually low. Foxworth ordered that the sodium test be repeated to check for an error. When the test came back the second time, it showed Lance's sodium level as 120. Foxworth ordered a three percent saline solution for Lance and transferred him to Greenville Memorial's pediatric intensive care unit. By 3:15 that day, Lance's brain had swollen to the point it was too badly damaged for him to survive. Lance remained in a coma until his death on June 18. This lawsuit ensued.
Plaintiff's expert, Dr. Allen Arieff, a specialist in hyponatremia, testifed Lance died as a result of his already low blood sodium level being further diluted by the quarter normal sodium IV solution. This resulted in water passing into his brain causing it to swell. The swelling brain compressed the nerves responsible for breathing. Another expert witness offered by the plaintiff, Dr. Duaine Murphee, concurred.
Arieff stated Porter breached the standard of care by failing to monitor Lance's blood sodium level after placing him on the dilute IV fluid. He further testified Lance could have been saved by simply turning off the IV before he stopped breathing.
The cases were submitted to the jury.[2] The jury found Porter negligent and awarded actual and punitive damages against her and Foothills Family Medicine Center, P.A. in both cases. After the verdicts, Porter moved for a new trial absolute on the ground that the verdict was grossly excessive. The court denied the motion. This appeal results.

*165 LAW

I. CLOSING ARGUMENT
Porter first argues the verdict should be reversed because of an alleged inflammatory closing argument which invited jurors to send a message which would put Spartanburg on the map and which "heaped abuse and scorn on defendant and her expert witnesses." Specifically, Porter refers to the following portions of the closing argument as being abusive:
Well I would like to know what the jury thinks about the real world because you have seen a real microcosm, a real picture here of what the real world is. And I think it comes from the nurses, and I think it comes from the experts who have been genuine and honest with you. And I think you have seen a sorted (sic) side of that world from another contingent of people. I could sit here and contend with you for a very long period of time to the many different ways you know you've seen.
* * * * * *
I don't know if you have ever heard about it or not, but there was a story about this particular child molester, multiple child molester, (sic) got out of jail and went to this particular neighborhood, and the authorities didn't let anyone know that he moved out of jail and into this quiet little neighborhood. And he took a girl and he did the same thing again. And they call that Megan's Law.
They passed a law as a result of that so that all child offenders from then on would have to give their locations, and people in the neighboring areas would have to know that the child molester was there because who knows what man moves next door to you and has cute little bunnies that attract little children or gives them candy or whatever and maybe you just think he's nice. If you knew he was a child molester, (sic) you would have been told, you wouldn't dare let your child go over there.
Well, we will never forget Megan. Her life ended, but we will never forget her because of Megan's case, Megan's Law. I want to create Lance's Law because of a much bigger reason than just those four things. I want to create Lance's Law so that whatever exotic location doctors are *166 teaching each other continuing medical education, whether it's Acapulco, Miami, or wherever and whatever medical school they are in, every time someone on the program will spend thirty minutes to an hour saying, I want to bring you up to date on Lance's Law.
* * * * * *
Let me turn to this chart. I have seen this chart coming all throughout the case and you all have too. Each witness that came upit seems to be significant to Mr. Davis that he can write down thousands of children that these people have seen, and they all say they have never seen hyponatremia cause cerebral edema in a child. And that's supposed to be a big point somehow or another for you all.
Ladies and gentlemen, isn't the reason that that's (sic) the case is because like Dr. Tecklenburg says, (sic) If you take a thousand residents with a thousand children who had 131 or 130 sodium they're not going to give a quarter normal saline. Yes, very luckily these people are not going to see hyponatremia induced by hypotonic dilute solution of quarter normal saline because every human who's been to medical school knows not to do it.
And if there are a few fools left who would do it, they check it the next morning to see if it's hurt the child, and when they find out that it's lowered they stop it. That's it; that's why you don't see it. It's kind of like you don't see people with scalpels sticking out of their eyeballs coming out of surgery. Doctors don't do that, and that's why they haven't seen it.
Porter argues that plaintiffs counsel's argument "equated Dr. Porter's treatment of decedent with the actions of a serial child molester." Porter also interprets the statement by plaintiffs counsel, "And if there are a few fools left who would do it, they check it the next morning to see if its hurt the child, and when they find out its lowered it[,] they stop it." as equating her to a fool.
We initially note Porter failed to raise a contemporaneous objection to any of the alleged inflammatory comments. The proper course is to immediately object to an improper argument. See Moore v. Florence School Dist. No. 1, 314 S.C. 335, 339, 444 S.E.2d 498, 500 (1994); Hawkins v. Pathology Assoc. *167 of Greenville, 330 S.C. 92, 111, 498 S.E.2d 395, 406 (Ct.App. 1998).
Despite her failure to object, Porter contends this issue was properly raised by post-trial motion. However, it is clear from the record that although defense trial counsel mentioned plaintiff's counsel's closing argument in his post-trial motion for a new trial, he was not actually objecting to the argument itself.[3] Moreover, even if we were to find that defense trial counsel raised this issue in his post-trial motion, in order to be timely, an objection usually must be made at the earliest possible opportunity. Rule 103(a)(1), SCRE; 4 C.J.S. Appeal & Error § 214 (1993). Ordinarily, if an appellant fails to object the first time a statement is made, he or she waives the right to raise the issue on appeal. See State v. Somerset, 276 S.C. 220, 221, 277 S.E.2d 593, 594 (1981).
Porter nonetheless relies on Dial v. Niggel Assoc., Inc., 333 S.C. 253, 509 S.E.2d 269 (1998) and Toyota of Florence, Inc. v. Lynch, 314 S.C. 257, 442 S.E.2d 611 (1994) for the proposition that the failure to make a contemporaneous objection is excused when the challenged argument concerns the abuse of a party or witness. She asserts just such a situation occurred in the instant case. However, in reviewing the objectionable statements in context, we do not find the use of the word "sordid" used to describe a "side of the world" in any way heaped abuse and scorn on Dr. Porter or on her expert witnesses. Additionally, we find counsel's statement regarding Megan's law indicates it merely refers to verdicts sending messages.
Finally, the statement regarding "fools", when viewed in the context of the argument, was clearly a reference to the standard of care. Furthermore, in Dial our supreme court emphasized the narrowness of its holding in Toyota. See Dial, 333 S.C. at 257, 509 S.E.2d at 271 (providing in dicta that statement "[T]hey have sewed (sic) deceit, deception, lies and *168 misconception. And they are the ones trying to trick you." did not rise to the level of a Toyota argument when considered in context). Similarly, we hold the allegedly improper statements in this case do not rise to the level of those in Toyota.

II. DAMAGES
Porter secondly argues the verdicts were so excessive, they must have resulted from passion, partiality, prejudice, and other improper considerations. We disagree.
We preface our analysis of the damage awards here with the touchstone that "[o]ur Supreme Court has repeatedly stated: The proper amounts to be rendered, as actual or punitive damages, are left, under our law, almost entirely to the trial jury and the trial judge.'" Gasque v. Heublein, Inc., 281 S.C. 278, 287, 315 S.E.2d 556, 561 (Ct.App.1984) (citing Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719, 729 (1942) as quoting from Weeks v. Carolina Power & Light Co., 156 S.C. 158, 153 S.E. 119, 124 (1930)).

Wrongful Death Action
Damages recoverable in a wrongful death action include: "(1) Pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society, the loss of his experience, knowledge, and judgment in managing the affairs of himself and of his beneficiaries...." F.P. Hubbard & R.L. Felix, The South Carolina Law of Torts 610 (2d ed.1997) (citing Mishoe v. Atlantic Coast Line R.R., 186 S.C. 402, 197 S.E. 97 (1938)).
Moreover, South Carolina law provides that parents such as Lynn are entitled to a presumption of nonpecuniary damages. Mock v. Atlantic Coast Line R.R. Co., 227 S.C. 245, 259, 87 S.E.2d 830, 836 (1955); Self v. Goodrich, 300 S.C. 349, 352, 387 S.E.2d 713, 714-15 (Ct.App.1989); see also Felix & Hubbard, supra, at 615 ("It may often be assumed that grief and sorrow will be experienced at the loss of a loved one; however, the strength of such presumption is a function of the *169 closeness of the relationship, and in some cases evidence may be necessary to support claims of loss.") (emphasis added).
In Self, a mother brought a wrongful death action against a physician and hospital for medical negligence resulting in the death of her infant son. At the close of her case, the trial judge granted a directed verdict for the defendants because the mother failed to present any evidence of damages. This court reversed, relying partly on Mock, holding the mother was entitled to a presumption of nonpecuniary damages such as mental shock, suffering, grief and sorrow, and therefore the issue of damages should have gone to the jury. Self, 300 S.C. at 352, 387 S.E.2d at 714-15.
Here, Porter contends there was a dearth of evidence on the issue of Lynn's damages. We first note the record does not contain a directed verdict motion by Porter based on the insufficiency of the evidence. Thus, it does not appear Porter raised this issue during the evidentiary portion of the trial. However, even if the issue is preserved, we find Lynn was entitled to the presumption discussed by this court in Self, thereby making the question of damages one of fact for the jury to determine.
In addition to this presumption, the record demonstrates Lynn cared greatly for Lance. Porter testified Lynn was a good mother. Nurses' notes indicate Lynn was worried about him. Lynn stayed with Lance in his room all night when he was admitted to Spartanburg Regional. She summoned the nurses the next morning because of her concern for his condition. Lynn witnessed Lance's increasing disorientation to the point he could not recognize her. She saw his combativeness and restlessness during the night as his brain swelled. She cleaned him up when he vomited. When informed of what happened to Lance during the CAT scan, Lynn cried as any caring mother would.
A determination of reasonable compensation for nonpecuniary damages turns on the facts of each case and is usually left to the jury's discretion. Felix & Hubbard, supra, at 615. We must bear in mind this case involves a young, loving mother *170 who lost her infant child. There is no mathematical formula which can easily establish the value of this kind of loss, and it is not this court's place to do so. See Lucht v. Youngblood, 266 S.C. 127, 137, 221 S.E.2d 854, 859 (1976) (Losses to parents from the untimely death of a child "are intangibles, the value of which cannot be determined by any fixed yardstick. Their loss to the beneficiaries must be estimated by the jury in the exercise of their sound judgment under all the facts and circumstances of the case."). We find the $1.5 million dollars awarded in actual damages is not grossly excessive and was not the product of passion or prejudice or other improper considerations. See Knoke v. South Carolina Dept. of Parks, Recreation and Tourism, 324 S.C. 136, 142, 478 S.E.2d 256, 258 (1996) (affirming $3,000,000 verdict for parents' grief, shock, and sense of loss in wrongful death of child) (citing Roberts v. Stevens Clinic Hospital, Inc., 176 W.Va. 492, 345 S.E.2d 791 (1986) (finding $3,000,000 appropriate amount for wrongful death of year old child)).

Survival Action[4]
Unlike actual damages in a wrongful death action, actual damages in a survival action are awarded for the benefit of the decedent's estate rather than for the family. See Felix & Hubbard, supra, at 622-23 (citing Bennett v. Spartanburg Ry., Gas & Elec. Co., 97 S.C. 27, 81 S.E. 189 (1914); Croft v. Hall, 208 S.C. 187, 190, 37 S.E.2d 537, 538 (1946)). Appropriate damages in survival actions include those for medical, surgical, and hospital bills, conscious pain, suffering, and mental distress of the deceased. See Gowan v. Thomas, 237 S.C. 223, 225, 116 S.E.2d 761, 762 (1960); Croft, 208 S.C. at 193, 37 S.E.2d at 539.
*171 There was no evidence of medical or hospital bills other than the $85.00 Porter charged for visiting the hospital room and comforting Lynn after Lance stopped breathing during the CAT scan. However, there was significant circumstantial evidence of Lance's conscious pain and suffering.
The nurses' charts indicate Lance was irritable and slept fretfully from midnight until approximately 5:45 a.m. He vomited. He became combative, pulling at his monitors and fighting his mother. His mother was unable to console him. There is also Lance's own statement, overheard by the nurse: "Mommy, I no feel good. Hold me." This is competent evidence of the demonstrable suffering Lance experienced before the catastrophic event which caused him to stop breathing. Furthermore, Dr. Arieff testified that Lance's brain continued to swell until it was forced through a hole in the base of the skull, where it squeezed the breathing and heartbeat centers of the brainstem, slowing Lance's heart rate, reducing his body temperature to hypothermic levels, and eventually stopping his breathing. This is additional evidence from which the jury could have inferred pain and suffering which preceded Lance's coma and death. See Vereen v. Liberty Life Ins. Co., 306 S.C. 423, 432, 412 S.E.2d 425, 431 (Ct.App.1991) (stating jury could infer conscious pain and suffering from evidence).
We find the award of damages to be in line with such awards in other cases. See New Prospect Drilling Co. v. First Commercial Trust, N.A. 332 Ark. 466, 966 S.W.2d 233 (1998) (affirming $1,000,000 conscious pain and suffering award based on testimony of one accident witness regarding decedent's condition during period immediately following accident before paramedics arrived); Holston v. Sisters of the Third Order of St. Francis, 165 Ill.2d 150, 209 Ill.Dec. 12, 650 N.E.2d 985 (1995) (affirming $1,000,000 conscious pain and suffering and disfigurement award where evidence would allow jury to infer suffering although time period of only several hours elapsed from time when fatal medical negligence occurred to when decedent slipped into coma from which she did not recover). Therefore, we hold the award of six hundred thousand dollars for actual damages was not so excessive as to be a product of prejudice and passion.

*172 Punitive Damages
Porter contends the punitive damages awards in the wrongful death and survival actions are unsupportable on the record and do not meet the Gamble[5] analysis for such awards. We disagree.
In South Carolina, "punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future." Moreover, they serve "as a vindication of private rights when it is proved that such have been wantonly, willfully or maliciously violated. Lastly, punitive damages may be awarded only upon a finding of actual damages."
Gamble v. Stevenson, 305 S.C. 104, 110, 406 S.E.2d 350, 354 (1991) (citations omitted). "In order to receive an award of punitive damages, the plaintiff has the burden of proving by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights." Lister v. NationsBank of Delaware, N.A., 329 S.C. 133, 149, 494 S.E.2d 449, 458 (Ct.App.1997). The amount of punitive damages awarded is largely within the jury's discretion, though reviewable by the trial judge. Gamble, 305 S.C. at 112, 406 S.E.2d at 355. Moreover, the reviewing trial judge is vested with considerable discretion over this amount, and our review is limited to correction of errors of law. Lister, 329 S.C. at 149, 494 S.E.2d at 458.
The factors enunciated in Gamble are:
(1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) "other factors" deemed appropriate.
305 S.C. at 111-12, 406 S.E.2d at 354. The trial judge is not required to make findings of fact for each factor to uphold a punitive damages award. McGee v. Bruce Hosp. Sys., 321 S.C. 340, 346, 468 S.E.2d 633, 637 (1996).
*173 We find the record demonstrates sufficient evidence of Porter's reckless culpability to support an award of punitive damages. Porter was Lance's admitting physician and primarily responsible for his care. Porter did not order an AB monitor for Lance, nor did she order follow-up sodium tests which by all plaintiffs experts' accounts would have saved Lance's life. Dr. Arieff s testimony was that Lance could have been saved by simply turning off the IV before he stopped breathing. In contrast to Porter's assertion she intended for Lance to go immediately for a CAT scan when informed of his altered mental status, Lance's mother testified Porter told her Lance would go to the CAT scan "sometime" that morning. The totality of the testimony suggested Porter had a disinterested attitude in the midst of what should have been growing concern for her patient. Clearly this is evidence Porter recklessly failed to realize the urgency of Lance's condition and failed to act quickly to save his life and was therefore highly culpable.
In examining the record, we find the trial judge properly reviewed the punitive damage awards using the Gamble factors. The trial judge stated:
Specifically, the Court finds that the defendant has the ability to pay, that the defendant's degree of culpability was very high, if not 100 percent, that the defendant was aware of her actions. There is no evidence of any past conduct, however the Court feels that this award of punitive damages is likely to deter others from this type of conduct in the future. The Court further finds that the award of punitive damages is reasonably related to the injuries suffered in this particular case.
We concur in the trial judge's assessment of the punitive damages award. Accordingly, for the above reasons, the judgment of the lower court is
AFFIRMED.
STILWELL, J., and MOREHEAD, Acting J., concurring.
NOTES
[1] These are seizures due to a fever.
[2] The record does not indicate trial counsel for Porter made a motion for directed verdict.
[3] Trial counsel stated: "With regard to these damages and with regard to a couple of the comments by Mr. Spears, I don't think I said anything about objecting or having objected to comments about Meagan's Law. What I am saying, and I hope I made it clear, is that the evidence in this case has to do with allegations of medical negligence and whether or not that's occurred."
[4] Porter's counsel argues in his brief that "there is nothing in the record to support the Six Hundred Thousand Dollars conscious pain and suffering." In oral argument before this Court counsel for Porter repeatedly asserted there was no evidence in the record to support an award of damages in the survival action. If indeed that had been the case, it would have been incumbent upon defense counsel to move for a directed verdict on that ground in order to preserve the issue for appeal. Thus, we construe counsel's argument to be directed to the amount of the damages awarded rather than to the lack of any evidence to support an award of actual damages.
[5] Gamble v. Stevenson, 305 S.C. 104, 406 S.E.2d 350 (1991).